CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED
SEP 1 0 2013
JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| JENNIFER B. PITTMAN, | ) | CASE NO. 5:13CV00001 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | By: B. Waugh Crigler |
| Defendant. | ) | U. S. Magistrate Judge |

  This challenge to a final decision of the Commissioner which denied plaintiff's March 26, 2010 protectively-filed applications for a period of disability and disability insurance benefits and supplemental security income under the Social Security Act ("Act"), as amended, 42 U.S.C. §§ 416, 423, and § 1381, et seq., is before this court under authority of 28 U.S.C. § 636(b)(1)(B) to render to the presiding District Judge a report setting forth appropriate findings, conclusions, and recommendations for the disposition of the case. The questions presented are whether the Commissioner's final decision is supported by substantial evidence, or whether there is good cause to remand for further proceedings. 42 U.S.C. § 405(g). For the reasons that follow, the undersigned will RECOMMEND that an Order enter DENYING the plaintiff's motion for summary judgment, GRANTING the Commissioner's motion for summary judgment, and DISMISSING this case from the docket of the court.

  In a decision dated September 9, 2011, an Administrative Law Judge ("Law Judge") found that plaintiff had not engaged in substantial gainful activity since December 18, 2009, her

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. (Dkt. No. 16.) Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin hereby is substituted for Michael J. Astrue as the defendant in this action.

alleged disability onset date.[2] (R.67.) The Law Judge determined plaintiff's "smoking-related lung disease vs. asthma," major depressive disorder, and generalized anxiety disorder were severe impairments.[3] (R. 67-68.) He also concluded that, through the date of the hearing, plaintiff did not suffer an impairment or combination of impairments which met or equaled a listed impairment. (R. 69-71.) Further, the Law Judge found that plaintiff possessed the residual functional capacity ("RFC") to perform a range of light work with the additional limitations that she avoid concentrated exposure to extreme heat, fumes, odors, dusts, gases, poor ventilation, etc., and was mentally limited to simple, routine, and repetitive tasks that involve no more than occasional interaction with the public, co-workers, and supervisors. (R. 71-73.)

In support of his decision, the Law Judge relied on portions of the testimony of Barry Steven Hensley, Ed.D, a vocational expert ("VE"), which were in response to questions premised on the Law Judge's RFC finding. (R. 65, 104-111.) Based on this testimony and his determination of plaintiff's RFC, the Law Judge found that plaintiff was able to perform her past relevant work as a file clerk. (R. 73-74.) Accordingly, the Law Judge concluded that plaintiff was not disabled. (R. 74.)

---

[2] Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A) (2004). Substantial gainful activity is "work activity that involves doing significant physical or mental activities," and it is typically determined by the amount of a claimant's earnings. *See* 20 C.F.R. §§ 404.1572 and 1574. The sequential evaluation is a five step process used by the Commissioner to evaluate whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4). If a claimant is found not disabled at any level prior to the final level, the inquiry is to stop. *Id.* In order to qualify for a period of disability and disability insurance benefits, plaintiff must establish that she became disabled prior to the expiration of her insured status, which is December 32, 2014. *See* 20 C.F.R. § 404.131(a); (R. 67, 114.)

[3] A severe impairment is any impairment or combination of impairments which significantly limits a claimant's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c).

Plaintiff appealed the Law Judge's September 9, 2011 decision to the Appeals Council. (R. 3-6, 60-61.) In its November 5, 2012 notice, the Council considered the additional evidence filed by the plaintiff on appeal (R. 3, 17-58), but it found no basis to review the Law Judge's decision, denied review, and adopted the Law Judge's decision as the final decision of the Commissioner. (R. 3-4.) This action ensued and briefs were filed.

The Commissioner is charged with evaluating the medical evidence and assessing symptoms, signs, and medical findings to determine the functional capacity of the claimant. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990); *Shively v. Heckler*, 739 F.2d 987 (4th Cir. 1984). The regulations grant some latitude to the Commissioner in resolving conflicts or inconsistencies in the evidence, which the court is to review for clear error or lack of substantial evidentiary support. *Craig v. Chater*, 76 F.3d 585, 589-590 (4th Cir. 1996). In all, if the Commissioner's resolution of the conflicts in the evidence is supported by substantial evidence, the court is to affirm the Commissioner's final decision. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence is defined as evidence, "which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than preponderance." *Id.* at 642. When the Appeals Council considers additional evidence offered for the first time on administrative appeal and denies review, courts must consider the record as a whole, including the new evidence, in determining whether the Commissioner's final decision is supported by substantial evidence. *Meyers v. Astrue*, 662 F.3d 700, 707 (4th Cir. 2011); *Wilkins v. Secretary*, 953 F.2d 93, 96 (4th Cir. 1991).

Plaintiff challenges the final decision of the Commissioner on several grounds. First, she argues that the Law Judge's finding that her impairments did not meet or medically equal the

12.00 mental health listings is not supported by substantial evidence.[4] (Dkt. No. 13, at 3-7.)

Second, plaintiff contends that the Law Judge's failure to find that her pulmonary condition medically equaled Listing 3.02, chronic pulmonary insufficiency, is not supported by substantial evidence.[5] (Dkt. No. 13, at 8-9.) Finally, plaintiff challenges the Law Judge's determination that she possessed the RFC to perform light work. (Dkt. No. 13, at 9-11.) The undersigned will consider these arguments below.

At the core of all three of these arguments is plaintiff's challenge to the Law Judge's decision not to credit the opinions of her treating physicians, Darin Christensen, M.D. and Robert Kennedy, M.D. (Dkt. No. 13, at 3-11.) In his June 2011 Mental Impairment Questionnaire, Dr. Christensen opined that plaintiff suffered major depression and general anxiety disorder, with a current Global Assessment of Functioning ("GAF") score of 40, indicating some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.[6] (R. 760.) Though he gave her a "fair" prognosis and acknowledged that her highest GAF over the past year was 60,[7] Dr. Christensen indicated that plaintiff suffered numerous mental health signs and symptoms, which most certainly have vocational effects.[8] (R. 760-761.) He indicated that plaintiff suffered generalized anxiety and

---

[4] See 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listings 12.04, 12.06.

[5] See 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 3.02.

[6] The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational, and psychological functioning "on a hypothetical continuum of mental health-illness" at the time of examination. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32–34 (4th ed. 2000).

[7] A GAF score ranging from 51 to 60 denotes functioning with moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32–34 (4th ed. 2000).

[8] Including: anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with weight change, decreased energy, blunt, flat, or inappropriate affect; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; persistent disturbances of mood or affect; substance dependence; emotional withdrawal or isolation; persistent irrational fear of specific object, activity, or situation which results in a compelling

fear of leaving the house and being around others. (R. 764.) Finally, he opined that: (1) plaintiff's mental impairments had lasted at least two years; (2) they caused a more than minimal limitation of her ability to do any basic work activity; (3) they involved three or more episodes of decompensation of at least two weeks duration within a twelve month period; (4) even a minimal increase in mental demands or change in environment would cause decompensation; (5) her anxiety disorder completely prevented her from being able to function independently outside the home; and (6) she would miss more than four days of work per month as a result of her impairments and treatment. (R. 764-765.)

Meanwhile, in his June 2011 Pulmonary RFC Questionnaire, Dr. Kennedy opined that plaintiff suffered asthma, smoking related lung disease, and depression. (R. 768.) He cited plaintiff's July 2010 pulmonary function test results (R. 492-493), and he indicated that she suffered symptoms of shortness of breath, chest tightness, wheezing, rhonchi, episodic acute asthma, fatigue, and coughing. (R. 768.) He further revealed that plaintiff suffered moderate acute asthma attacks two to three times a year, incapacitating her for one to two weeks, and that they are brought on by upper respiratory infection, allergens, irritants, and cold air/change in weather. (R. 768-769.) Dr. Kennedy gave her a poor prognosis, and he indicated that she could walk one city block without rest, sit for more than two hours at one time, stand for 45 minutes at one time, sit for at least six hours of an eight-hour workday, stand or walk for less than two hours of an eight-hour workday, frequently carry less than ten pounds and occasionally carry up to twenty pounds, would need two to three thirty minute unscheduled breaks per week, could

---

desire to avoid the dreaded object, activity, or situation; intense and unstable interpersonal relationships and impulsive and damaging behavior; emotional lability; easy distractibility; sleep disturbance; and recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week. (R. 761.)

frequently perform postural activities, and had several environmental restrictions. (R. 770-771.) Finally, Dr. Kennedy indicated that plaintiff's impairments likely produced good and bad days and that she would ultimately miss two days of work per month as a result of her impairments and treatment. (R. 771.)

The opinions of treating physicians that are consistent with the other substantial evidence of record and are well supported by medically acceptable clinical and diagnostic techniques are entitled to controlling weight. *See* 20 C.F.R. § 404.1527(c)(2). Otherwise, the Commissioner may assign such significantly less weight. *See Craig. v. Chater,* 76 F.3d 585, 590 (4th Cir. 1996). Several other factors also play a role in determining the weight to assign medical opinions of record, including the length, nature, extent, and frequency, etc., of the treatment relationship. *See* 20 C.F.R. § 404.1527(c). Here, the Law Judge found that neither opinion was entitled to controlling weight and gave reasons for those findings. (R. 73.) He concluded that neither opinion provides supporting evidence or is supported by the other medical evidence of record, that they essentially adopted plaintiff's statements without balance or objectivity, having previously found plaintiff's statements to not be credible; that the opinions do not reflect a familiarity with the SSA disability program; and that the ultimate issue of disability is reserved for the Commissioner. (R. 73.)

Having carefully reviewed the record and the Law Judge's decision, the undersigned finds that the Law Judge's decision to assign little weight to the opinions of plaintiff's treating physicians is supported by substantial evidence. Beginning with plaintiff's mental impairments, Dr. Christensen's opinion is both internally inconsistent and inconsistent with the other significant evidence of record. Dr. Christensen opined that plaintiff had a GAF of 40, which suggests she would not be capable of performing substantial gainful activity, and that she

suffered numerous symptoms: including, difficulty thinking or concentrating, emotional withdrawal or isolation, easy distractibility, anxiety from leaving the home and interacting with others to the point of "complete inability to function" outside of her home, etc. (R. 760-761.) However, he also concluded that plaintiff was limited but satisfactory or better in all mental abilities and aptitudes needed to perform semiskilled work, skilled work, and "particular types of jobs." (R. 763.) Such mental abilities and aptitudes included remembering detailed instructions, carrying out detailed instructions, setting realistic goals or making plans independent of others, dealing with stress of semiskilled and skilled work, interacting appropriately with the general public, maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, travelling in an unfamiliar place, and using public transportation. (R. 763.) Dr. Kennedy also opined that "emotional factors" did not contribute to the severity of plaintiff's symptoms and functional limitations, that her symptoms rarely interfered with her attention and concentration necessary to perform simple work tasks, and that while her depression was difficult to control, she mentally was capable of performing low stress jobs. (R. 769.)

Furthermore, the medical record does not support Dr. Christensen's conclusions. While plaintiff testified that her anxiety prevented her from leaving the home for two weeks, three to eight times a year (R. 93-94), no support for those allegations is found outside of Dr. Christensen's report. Despite claiming that she was unable to leave the house for as many as 22 weeks over the last two years, only Dr. Christensen's records ever mention that she has any difficulty leaving the home, much less for such extended periods. Physical examinations by other treatment providers, which generally occurred at least once a month throughout the relevant period, rarely refer to plaintiff's mental impairments, and the references that do exist do not suggest a disabling condition or any problem leaving the home.

In March 2010, plaintiff was diagnosed with depression, but her affect was normal, and she indicated that her mood had actually been "pretty good" lately and that she had reduced her intake of clonazepam and stopped alprazolam, while still regular taking Lexapro and Ambien if she needed it. (R. 387.) In April 2010, plaintiff was diagnosed with anxiety, stated that her anxiety was getting worse, and was observed to speak in low tones and appeared fatigued, though she was also found to be appropriate, cooperative, pleasant, and in no distress. (R. 531.) In June 2010, plaintiff was diagnosed with depression and anxiety, though much of her grief was tied to her grandmother's impending death, and she reported being off one of her medications for two weeks because of insurance difficulties; and she was found alert, awake, appropriate, pleasant, interactive, and in no distress. (R. 486, 490, 537, 580.) Outside of Dr. Christensen's treatment notes, the undersigned has found no other references to current symptoms of depression or anxiety during the relevant period.[9]

Dr. Christensen's notes also do no suggest that plaintiff's mental status was disabling. Plaintiff was referred to Dr. Christensen by Dr. Kennedy in January 2010 for evaluation and treatment of depression.[10] (R. 660.) From what the undersigned can discern from Dr. Christensen's notes, he began to treat plaintiff in March 2010. (R. 658-659.) He did note that plaintiff reported sleep difficulties, family problems, depression and sadness, and he indicated in May 2011 that she "couldn't leave the house," around the same period of her grandmother's death and her brief inability to purchase Lexapro. (R. 654-659.) However, he noted in March 2010 that plaintiff was doing very well on medication, with greatly improved confidence,

---

[9] Though Dr. Kennedy diagnosed with plaintiff depression in February 2011, he found her mood stable, and an emergency room report in the same month found her affect normal. (R. 636, 665.)
[10] The Law Judge found that plaintiff began treatment with Dr. Christensen in June 2010. (R. 72.) While the undersigned acknowledges that the date on the referral order is difficult to read and could be from either January or June, the fact that plaintiff's first treatment note is from March strongly suggests that plaintiff was referred in January. (R. 659-660.)

including in going into places outside the home like Walmart. (R. 658.) He also noted that while plaintiff still had some trouble leaving the house in late May and June 2011, she was "75% better" on medication and frequently traveled outside her home. (R. 654.) There is no suggestion in these records that plaintiff could not leave the house for weeks at a time or that she suffered disabling symptoms from her mental impairments.

The Law Judge is in the best position to resolve inconsistencies in the record, and his findings regarding Dr. Christensen's opinion are supported by substantial evidence. *See Craig v. Chater*, 76 F.3d 585, 589-590 (4th Cir. 1996). There are internal inconsistencies in Dr. Christensen's evidence, and his opinion conflicts with the other evidence of record including the lack of mental health symptoms in the reports of other treatment providers. It appears he relied on plaintiff's allegations, which the Law Judge found to not be entirely credible and, themselves, show inconsistencies, with what are minimal mental examination findings with limited treatment.

There is also substantial evidence supporting the Law Judge's decision to not fully credit Dr. Kennedy's opinion. First of all, contrary to plaintiff's arguments, none of plaintiff's pulmonary function tests, even those from July 2010 and June 2011, indicate that she met the requirements of Listing 3.02. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 3.02; (R. 466, 492, 572, 587, 682, 732, 781.) Plaintiff has also not pointed to any evidence, nor is there any, supporting her suggestion that her condition medically equaled a listing. *See Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (it is the claimant's burden to demonstrate that he or she meets or medically equals a listing). Furthermore, a careful examination of the record for the entire relevant period reveals substantial evidence supporting the Law Judge's conclusion that her condition is not as serious as she claims or as Dr. Kennedy opined.

A pulmonary function test performed in July 2009 indicated that plaintiff's FEV1 and FVC were 1.7 L and 2.18 L, 77% of predicted, and her diffusion capacity was 13, 72% of predicted. (R. 466.) Plaintiff's oxygen saturation was 98%, and her lungs were clear to auscultation. *Id.* There had been no interval change over the intervening 6 months, plaintiff indicated that she had stopped smoking in September 2008, and she claimed she had no significant problems carrying out her daily activities. *Id.* Physical examinations in September and November 2009 were also normal with good oxygenation, breath sounds, and aeration, though there was indication that plaintiff had started smoking again. (R. 564, 567.)

In December 2009, plaintiff was reported to be still smoking half a pack of cigarettes a day and showed end inspiratory and expiratory wheeze diffusely, diminished breath sounds, and shortness of breath in conversation. (R. 389.) She was diagnosed with bronchitis with reactive airway disease and prescribed medication. *Id.* In January 2010, a report noted that plaintiff suffered coughing and hemoptysis, and chest imaging demonstrated mild chronic changes in her lungs which appeared stable. (R. 372.) Plaintiff also presented with bronchitis and worsening cough that prevented her from working. (R. 388.) She stated that her inhalers were not working significantly and that she had been coughing up blood and blowing it out her nose. *Id.* Plaintiff was found to be in mild respiratory distress with diffuse expiratory wheezes and scattered rhonchi but with no focal rhonchi and fair to good air movement throughout, and she was diagnosed with asthma exacerbation with bronchitis or pneumonia. *Id.* In a February 2010 emergency room report, plaintiff indicated that she was trying to quit smoking, and her condition was found to have improved, with good oxygenation at 96%, lungs clear to auscultation, and no major symptoms other than coughing. (R. 406-407.) In March, plaintiff indicated that she had cut her smoking down from two packs a day to one third of a pack, but stated that her asthma

seemed worse and that her medications were not helping. (R. 387.) Physical examination revealed that plaintiff was coughing often, with diffuse rhonchi and expiratory wheezing. *Id.* She was diagnosed with asthma exacerbation, and her medication was adjusted. *Id.*

Plaintiff's spirometry results actually improved in April 2010, with FVC and FEV-1 at 2.22 L and 1.73 L respectively, 79% of predicted, though her diffusion capacity declined to 10.9, 61% of predicted. (R. 572.) James Long, M.D. concluded that plaintiff's condition was mild with only "slightly decreased" diffusion compared to July 2009, with "otherwise essentially no change." (R. 573.) Plaintiff's physical examination by Manojkumar Patel, M.D. was largely normal, though Dr. Kennedy noted expiratory wheeze diffusely with fair to poor air movement throughout, and she was diagnosed with worsening shortness of breath over the last 2-3 months, described by Dr. Kennedy as worsening restrictive lung disease; occasional bouts of productive cough with minimal hemoptysis, and ongoing tobacco abuse ranging from one fourth to half a pack a day. (R. 463-464, 531.) Plaintiff's medications were changed, the importance of smoking cessation, given the nature of her condition, was discussed; and plaintiff agreed to stop smoking without assistance. *Id.*

Imaging evidence from May 2010 indicated that plaintiff's interstitial lung disease had been slightly progressive since 2008. (R. 459.) Plaintiff indicated that she quit smoking, though was still exposed to secondhand smoke from her husband, and she reported a slight interval improvement in exercise, though not back to baseline; occasional cough; and physical examination findings were normal. (R. 460-462, 576.) By June, plaintiff reported increasing shortness of breath with physical activity and continued wheezing with shortness of breath, though she was in no real cardiopulmonary distress, and her lungs where clear to auscultation, though with diminished breath sounds throughout. (R. 486.) Other physical examinations were

largely normal, though plaintiff reported worsening shortness of breath, giving her severe trouble at night, for which she was diagnosed with acute bronchitis. (R. 490, 580.) It was also pointed out that plaintiff continued to smoke half a pack a day. *Id.*

Plaintiff's condition noticeably declined by July 2010. (R. 484, 492-493.) In July, her pre-medication pulmonary function test results were 1.66 L FVC and 1.30 L FEV-1, 59% of predicted, and 11.7 for diffusion capacity, 65% of predicted. (R. 492.) However, her treating source concluded that plaintiff's condition remained mild, with "mild restrictive respiratory impairment, with proportional diffusion deficit," and normal oxygen saturation and well tolerated physical activity up to 400 yards, with some reduction in plaintiff's vital capacity since April 2010. (R. 493.) Moreover, Dr. Patel found that this decline was a result of plaintiff's recent episode of acute bronchitis rather than representing a "true deterioration of lung function associated with progression of smoking-related lung disease." (R. 501.) Dr. Patel revealed plaintiff reported resolution of bronchitis symptoms, significant improvement in exertional dyspnea, and that her exercise tolerance was back to baseline, and she denied wheezing, increase in phlegm, or any new cardiopulmonary symptoms. (R. 501.) Physical examination findings also showed normal oxygen saturation and bilateral equal air entry without crackles, wheezes, or rhonchi. (R. 502.)

Plaintiff's condition improved greatly from August through December 2010. Though Dr. Kennedy reported that plaintiff complained of continued shortness of breath and upper respiratory trouble involving postnasal drip and possible sinusitis, he noted that her lungs were clear to auscultation bilaterally with fair air movement throughout. (R. 482.) A new pulmonary function test showed interval improvement at FVC and FEV1, to 2.1L and 1.57L, 75% and 72% of predicted, and stable diffusion capacity; with normal oxygen saturation with up physical

activity up to 429 yards; and a physical examination produced normal findings. (R. 498-500, 587-588.) Plaintiff also indicated that she could perform day-to-day activities without significant limitations, though at a slow pace. *Id.*

Improvement in plaintiff's condition is most apparent in her December 2010 pulmonary function and exercise oximetry test results. There, plaintiff's pre-medication FVC was 2.24 L, 80% of predicted; her FEV-1 was 1.83 L, 84% of predicted; and her diffusion capacity was 12.9, 69% of predicted. (R. 681.) Her oxygen saturation was normal with "well tolerated activity up to 400 yards." (R. 682.) Dr. Long concluded that plaintiff's restrictive respiratory impairment and diffusion deficit were mild and that she had demonstrated overall improvement since July 2010. (R. 682.) Plaintiff's spirometry results for this period were found to be relatively normal, and her diffusion capacity was within the low normal limit. (R. 626.)

In January 2011, plaintiff did not complain of any pulmonary problems and demonstrated normal lung function, with Dr. Patel reporting that she was doing "quite well." (R. 626, 673, 679.) Plaintiff started smoking again in February 2011 and immediately displayed worsening cough and chest congestion. (R. 626.) However, she stated that she stopped smoking immediately and displayed normal oxygen saturation and lung function. (R. 627.) Plaintiff was again advised of the importance of smoking cessation and prescribed Chantix given her high risk of restarting smoking. (R. 627, 636, 665.) Plaintiff displayed normal examination findings and had no further complaints concerning her lung function in March, April, and May 2011, though successful surgery was performed to correct her chronic sinusitis and plaintiff was found to still be smoking less than half a pack a day. (R. 641, 643, 646, 648, 702, 706, 714, 730, 746, 752.)

However, June 2011 pulmonary function test results were significantly worse, with an FVC of 1.53 L, 55% of predicted; an FEV1 of 1.11 L, at 51% of predicted; and a diffusion

capacity of 9.1, 52% of predicted. (R. 732.) Dr. Long found she suffered a moderately severe restrictive respiratory impairment, with a moderate reduction in diffusion capacity and a significant overall performance decline since December 2010. (R. 733.) Yet, in the same month, plaintiff also displayed normal oxygenation and bilaterally clear and equal breath sounds on physical examination, and made no complaints of breathing problems. (R. 734, 740, 745, 801, 804.) Plaintiff did not seek treatment or complain of breathing difficulties throughout the rest of the relevant period in July and August 2011. (R. 795, 797, 799.) Thereafter, plaintiff complained of coughing, sinus congestion, and some shortness of breath, and indicated that she had quit smoking in July, having been smoking a pack a day at the time. (R. 794.) During this period, plaintiff generally displayed some wheezing, diminished breathing sounds, and reduced oxygen saturation. (R. 780, 783, 787, 789.)

Plaintiff's pulmonary function results in February 2012, post-dating the period relevant here, demonstrated that plaintiff's condition improved. The pre-medication test results indicate that her results were 75% of predicted for FVC and FEV-1 and 74% of predicted for diffusion capacity. (R. 781.) Compared to her results in July 2009, these findings show only a slight reduction in spirometry results and a slight improvement in diffusion capacity. (R. 466, 781.) Plaintiff was found to suffer a mild restrictive respiratory impairment and a mild diffusion deficit and displayed "significant overall improvement" since June 2011.[11] (R. 782.)

Accordingly, objective evidence demonstrates that the severity of plaintiff's condition has varied from 2009 through 2012, though, generally, the evidence has not shown significant decline since July 2009, when she revealed no significant limitations on her ability to work and

---

[11] While these test results are from several months after the Law Judge's decision, they are new, material, and relate back to the relevant period. *See* 20 C.F.R. § 404.970(b). Accordingly, they may be considered along with the rest of the record in determining whether the Law Judge's decision is supported by substantial evidence. *Id.*

perform daily activities. Her two worst pulmonary function studies, in July 2010 and June 2011, both occurred during periods of acute illness or shortly after plaintiff started smoking again.

Furthermore, the evidence substantially supports the Law Judge's finding that plaintiff's allegations were not entirely credible, and therefore that her treatment providers were not justified in relying on her subjective allegations in crafting their opinions. As the Law Judge pointed out, plaintiff's testimony is not perfectly in line with either her doctor's reports or with the other objective evidence of record. (R. 72-73.) Moreover, plaintiff has continued to smoke in spite of her doctors' recommendations. Smoking is the root cause of plaintiff's pulmonary impairments. She has been told that ceasing to smoke is the cornerstone of her treatment, and when she has followed doctors' orders to stop, her condition has improved. Plaintiff's failure to follow treatment recommendations provides a substantial evidentiary basis to discount her credibility, particularly here where there is no evidence of a regulatory justifiable reason for plaintiff's failure to do so. 20 C.F.R. § 404.1530; *See Hunter v. Sullivan*, 993 F.2d 31, 36 (4th Cir. 1992) (failure to follow a prescribed treatment plan can undermine credibility); *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (Law Judge appropriately considered claimant's failure to stop smoking in his credibility determination when claimant suffered pulmonary impairments).[12]

---

[12] While *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984) and the current regulations stand for the proposition that a claimant may have justifiable reasons for failing to follow prescribed treatment, neither the case nor the regulations prohibit the Commissioner from considering, as here, all attendant treatment circumstances in determining a claimant's credibility. *See Massy v. Astrue*, No. 0:11-2251-MGL, 2013 WL 178369, at *6-7 (D.S.C. January 17, 2013); *But see Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000) (the addictive nature of cigarettes renders any failure to comply with doctor's orders to stop an unreliable basis for a judging the claimant's credibility).

For all these reasons, it is RECOMMENDED that an Order enter DENYING plaintiff's motion for summary judgment, GRANTING the Commissioner's motion for summary judgment, and DISMISSING this case from the docket of the court.

The Clerk is directed to immediately transmit the record in this case to the presiding United States District Judge. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note objections, if any they may have, to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(l)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection. The Clerk is directed to transmit a certified copy of this Report and Recommendation to all counsel of record.

ENTERED: _____

U.S. Magistrate Judge

9-10-2013

Date